Good morning, your honors, and may it please the court. Dale Ogden for Orlando Burgos. I'll try to reserve three minutes of my time for rebuttal and I'll watch my clock. Okay, very well. Mr. Burgos was convicted based on the testimony of one man, a man who changed his story almost every time he told it. And Mr. Burgos was deprived of the right to confront that man that he had received a key benefit for his testimony, a U-Visa. But he hadn't received it when he gave his testimony, had he? No. On this record, what we know, your honor, is that he had applied for it and the district attorney had certified it. The prosecuting entity has to sign something. And beyond that, if I understand correctly from the record, Mr. Moya was questioned. Not only were you with the trial counsel, but whoever the trial counsel was cross-examined him about at least three different things where he either misrepresented or lied about them. So the jury at least saw that he was not necessarily a man of his word in everything. Isn't that enough in this case? So, your honor, I think this goes to that fourth factor of Van Arstle, what cross was permitted. No, that's not enough here for the same reason it was not in Fowler. We were allowed to cross-examine that Mr. Moya had changed his story, but we were not allowed to cross-examine why he did that. And that why is everything here. That why shows the bias. Why is that a bias? He filed an affidavit, which was one of the exhibits that you have, but was never used because you couldn't cross-examine. But what difference would that have made to the jury? I mean, the reality is, as a matter of law, the U visa is available in circumstances like this, right? Correct. Nothing else was promised. So it's really a question of weighing how much one more inconsistency or one more nudge would have made a difference, right? The only thing I would push back there on is the one more inconsistency part. Individuals change their story all the time for different types of reasons. And, you know, much like Fowler, much like Ortiz, we have a situation where the jury, they could have believed it was innocuous, they could have believed it was a lie or something, but they never heard the one motive for all this. They never got to view it through the lens of the fact that he was receiving this type of benefit. Mr. Ogden, if I remember correctly, you suggested in your brief that the way in which Mr. Moyer's story changed over time was consistent with your theory that he was motivated to change it to obtain the U visa. Could you explain what you mean by that? What exactly changed over time in ways that would have encouraged issuance of the visa? Absolutely, Your Honor. The principal one is that his wife, common law wife, Barquez, had originally reported a burglary. A burglary, of course, is not a U visa eligible offense. A couple weeks later, when he makes the report that ultimately alleges that he was kidnapped, that is when he says, you know, kidnapping, the assault, that type of thing. That's still months before the U visa application, right? As far as we know, yes. The crux of the problem there, though, is we don't know when this came into Moyer's mind. But he said he was assaulted in January. In the interview, what was it, January 23rd? Yeah, the end of January. And he said he was assaulted at that time. Correct. Is there any basis in the record for concluding that he was aware of the U visa program at all on January 23rd? No, but I think it's important to note there that that's sort of the Catch-22, the constitutional violation. If we weren't allowed to cross-examine him at trial to sort of flesh all this out, we're never going to know precisely when the U visa came into his mind. That's sort of the violation in and of itself. I'm sorry. Go ahead. To that point, though, let's just say arguendo. There was a constitutional violation of Crawford. I think everybody agrees on that. Let's say that Van Arsdale was not complied with. You still have the problem of Brecht. That's what I'm struggling with because the reality is the jury didn't believe, I'm going to put it this way, its belief in his testimony was not affected by the three successful cross-examination questions that were posed. I'm struggling with why the U visa, had it been where, had it been available at that time, would have made any difference. Why am I wrong about that? Sure, Your Honor. As far as Brecht, again, we're talking de novo review here. All of the Van Arsdale factors, for the reasons that we argue in the brief, go our way, and I think it's important to just flag the first one. The State concedes the first two, and that first one is important because all of the cases that look at this talk about the importance of the witness's testimony. Again, the State concedes that, and that's what, for example, in Fowler, Your Honor's decision, and Hawley all sort of hang their hat on. This is a critical witness. And I respect that, counsel, but I guess what I'm struggling with, but let's just say that under Van Arsdale, you win on Ed Pie. Brecht, as you very well know, is a whole separate analysis. And in that, unlike the Van Arsdale analysis where you've got the factors we list, in the case of Brecht, we just have to see whether basically we just think the whole thing was a mess, that it just got it wrong, and it's de novo. Right. And I'm struggling with that. I really am. I realize I didn't satisfy Van Arsdale, but I'm wondering why the government didn't satisfy Brecht. Absolutely, Your Honor. Beyond the importance of Mr. Moya's testimony, I would point the Court to two things I think are important as far as determining prejudice de novo. The first would be the prosecutor's closing argument. I think it's fairly clear from the record that the entire thing was based on Moya's allegation. But what the prosecutor said in closing was, quote, they, the witnesses here, are receiving no benefit for telling their story in this case. No money, nothing in return. And at that time, that was true, wasn't it? Well, he received the benefit of being paroled in and the certification from the prosecuting entity. So he was paroled in to the U.S. for this case. Now, I was confused when you said that he didn't have a U visa because the Court of Appeals' opinion says, you know, that what was argued was that Moya's status as a holder of a U visa should be admitted. And did he not have the U visa? Wasn't that the basis for his parole? I'm very confused as to what the status. I recognize the record's kind of thin, but. Right, I think. Sorry, Your Honor. No, I was just saying, help me out here. Yeah, I think it might be just a little bit of semantics, but I agree with Your Honor. That's sort of the problem is filling in the gaps. But I think when somebody, I mean, so what happened is Moya submits the U visa declaration. After he's voluntarily removed, he's coming back into the U.S. He submits it, and he is paroled in for this case. So that, I'm not sure if there's something else that, for instance, ICE would need to process to make him a quote-unquote holder of the U visa. It's up to you, of course, but you only have a minute and a half, basically. If you want to use that time, think about it for a minute, come back and rebut, have a chance to research more what Judge Collins has inquired about. Absolutely, Your Honor. And just if I could conclude with Your Honor's question about the Brecht de novo. The other thing I would point the Court towards is we sort of have a split verdict here. The jury convicted on Accounts 5 and 6, which were criminal threats. They didn't convict on extortion and kidnapping for ransom. That was the prosecutor's whole theory of the case, though, that this whole thing was happening because of the extortion. And I think that sort of suggests there's some questions from the jury that suggests they might have been grappling with aiding and abetting and that type of thing. But I think it shows they were struggling to draw the connection between Zuniga and Burgos. Okay. All right, well, we'll have you rebut in a minute. Thank you, Your Honors. All right, Ms. Harris for the government, please. Good morning, Your Honors. Deputy Attorney General Julie Harris for Respondent. May it please the Court. I'd like to begin just by addressing the point. Can you get closer to the microphone, please? It's a little hard to hear you. Can I move them? Would that help? Yeah, please. Thank you. Is this good? Better. Okay. I'd like to begin by addressing the point that the Court was just discussing about whether the U visa had been granted prior to Moya's testimony and trial. The record reflects that it had been granted. Had or had not? Had been granted just prior to his testimony. The prosecutor stated in her amended trial brief at 2 ER 258 that the U visa had been granted prior to his testimony and that there were no preconditions placed upon the substance of his testimony at trial. Doesn't that cut against you? I don't think it does, Your Honor. I think that the fact that there were no preconditions placed on his testimony and he was already enjoying the benefits of it means that he had even less incentive, based on the U visa, to not tell the truth at trial. In other words, he already had the visa. It really didn't matter how he testified. Correct. And is there anything in the record that indicates that the government said, you know, we're going to give you this visa, but you've got to say X and Y in the trial? No, there's nothing in the record that says that. In fact, the opposite is true. The prosecutor stated that there were no preconditions placed on his testimony at trial. I'd like to turn now to the prepared remarks I have. Petitioner claims in the opening brief that there's a glaring hole in the record concerning how Moya would have testified at trial. But there is no mystery here. We know how he would have testified because he was questioned on these points at the preliminary hearing. And at the preliminary hearing, he claimed that if he had wanted a visa, he would have simply married his girlfriend of 15 years, Abarquez. Nor did he believe that the visa Would he actually have been eligible for that? Didn't he have a criminal record that would have interfered with that? I don't know, Your Honor. All I'm saying is that this goes to his state of mind and what he believed to be true about U.S. immigration law. I'm not saying that this was an accurate reflection of U.S. immigration law. But there was no testimony about what was said at the preliminary hearing at the trial. Is that correct? That's correct. But for purposes of Brecht, certainly we can consider this preliminary hearing testimony. Nor did he believe that it was a big benefit because he believed, for whatever reason, that he would be returned to Mexico immediately after testifying in this case. Essentially, this testimony reveals that he denied that the U visa was a motivating factor in his testimony. And when you couple that with the fact that the visa had already been granted prior to his actual trial testimony, it seems that there's very little incentive for him to fabricate testimony based on the U visa. Would you agree, though, Counsel? Arguendo. I think everybody agrees there was a confrontation clause violation. Let's say that Van Arsdale was not complied with and you lose under AEDPA. What is your best argument that the government should be successful under Brecht? The best argument is that there was this eight-month gap in between when he first reported his assault and kidnapping to the police and when he actually applied for the U visa. He significantly did not apply for a U visa when he was facing deportation proceedings sometime after February 2012, and instead he voluntarily returned to Mexico. And this is important because if he had known about the U visa at that point, that would have been the logical moment to apply for one if he was as eager to stay in this country and fabricate testimony as petitioner claims. Where in the record does it say that he took a voluntary departure to Mexico? I believe... It's in the declaration,  and I'm wondering, is it anywhere else in the record other than in the thing you're trying to keep out? There is testimony. He was cross-examined at trial, and defense counsel was trying to get in when exactly he had left the country, and what came out was that it was sometime after February 28, 2012. And I believe it's at least implicit, if not explicit, that he voluntarily left. So I want to make sure I understand and answer to my colleague's question. You're saying that the jury did hear or did not hear that he had voluntarily returned to Mexico? I don't... I believe there was... I think I'm talking about trial and not the preliminary hearing. I believe there was discussion at trial that he had... Although now that you're saying it, I know they weren't allowed to talk about the immigration implications. Yeah, I don't recall that in the trial examination. Maybe it was in the preliminary hearing. Can I just look very quickly at my notes? Lee, as you know, the District Court of Appeals basically, as I read it, said you got an eight-month period, and that's what you just referred to. Basically, Moya's testimony, had he been cross-examined, he could have been rehabilitated. He had these previous three questions that were asked of him where he didn't tell the truth or misrecalled, didn't affect the jury. And had this come up, it wouldn't have been that big a deal. It was just one more thing where he didn't recall correctly. The other side, of course, will say, well, wait a minute, this is a big deal. He got something from this. This is the very kind of thing that we need to tell the jury that he got something for his testimony, even though there's no record that he did. What's your response to that? I think the reasonable inference, at the very least, is that he didn't know about the U-Visa when he first gave his statement to the police in January. And even Petitioner agrees that on the major points of the crime, he's been consistent over time. He's been consistent about the criminal conduct and the criminal actors in this case. When you say he didn't know about the visa, you mean when he told all the things that the other side disagrees with, he didn't even know there was such a visa, right? Yes. I'm saying there's no evidence he knew about it and the reasonable inference of him giving his statement to the police and then not applying for the U-Visa until over eight months later. And that would be the point I suppose the Court of Appeal was talking about, that he could have been rehabilitated because he said back eight months before in the preliminary hearing he testified what he did. He didn't even know there was a U-Visa, so testimony on that point didn't change. Is that your position? That's my position, yes. That, again, though, requires us to believe Mr. Moya, right? Correct. Let me ask one of the things that troubles me here, Ms. Harris, which is in this relationship between the Van Arsdale factors and the Brecht analysis. Van Arsdale tells us that we have to assume that the damaging potential of the cross-examination that was prevented would have been fully realized. And that, well, I have to say, an awful lot of the discussion here with you sounds like a jury argument about Mr. Moya's credibility. And I would have thought the reason we're here is in essence that those arguments could not be made because of the infringement of his ability to cross-examine Mr. Moya. I think that if we're talking about Van Arsdale, Van Arsdale was a different case from this one in that the facts are different. In this case, we have preliminary hearing testimony that was subject to cross-examination and under penalty of perjury, which was very different from what they had in Van Arsdale. And the fact that they're different means that there has to be more wiggle room in order to accommodate for this countervailing evidence. I'm sorry, I'm not quite following. It sounds to me like you don't like the Van Arsdale assumption, the assumption that the cross-examination would have been fully realized and often things will change between preliminary hearings and trial. Van Arsdale applies, but I'm saying that because the facts are different between these two cases, Van Arsdale actually makes room for adding additional factors. The factors that they give are inclusive. And because of that, I think it's totally permissible to consider the countervailing evidence of the preliminary hearing testimony under Van Arsdale. So to be sure I understand your response to my colleague, you're saying that under Van Arsdale, it's perfectly appropriate for the court to consider all of the negative factors, not just the positive from the perspective of the defense. And, in fact, can weigh that in determining what was the most negative impact of the failure to give the confrontation. Is that right? I'm saying that that's true in this case. I'm saying in most cases you wouldn't have testimony that was subject to cross-examination and under penalty of perjury to consider. But here, because we do, it's reasonable to consider that countervailing evidence even under Van Arsdale. Do either of my colleagues have... One question about the request for judicial notice. It seems to me that that issue turns on whether or not that declaration is part of the record of the state proceedings, because if it was, then we could take account of it. But nobody referred to California rule of court 8.320, which has a special rule about exhibits. And it says, Exhibits admitted in evidence refused or lodged are deemed part of the record but may be transmitted to the rearing court only as provided in rule 8.224. And nobody transmitted the declaration so far as we can tell from the docket. But why doesn't that make it part of the record? So exhibits are not like the normal rule in state court where if it's not in the clerk's record, it didn't happen, which is not how we operate, but that's how they operate. But they don't treat exhibits that way, so why can't we just take it given that rule? My response, I guess I'm not aware of that rule. The fact that it wasn't admitted into the record and was explicitly denied as an exhibit... It says exhibits refused are deemed part of the record. If that is indeed the rule, then I would say that it's part of the record. I don't have another response to that if that's the rule. And if it is part of the record, does that help you or hurt you? That hurts me. And since it wasn't sent to us, does that help you or hurt you? In light of what? Yes, in light of 10E2, it's true that it wasn't before the district court, so the district court didn't consider it as part of its review of the case. So that weighs against it. But my argument about whether it was part of the state record, obviously your colleague has given me a rule that says it was. But you said it would be hurtful. What in there is hurtful to you in that declaration? Oh, I don't think there's anything that's hurtful to me. I thought you just said that you thought it was hurtful. I did, too. Oh, sorry, I misspoke then. No, I was just saying the rule that you brought up was harmful to my position. I thought you meant it was hurtful on the Brecht et al. No, there's nothing in the substance of the declaration that I'm concerned about being before the court. It's actually helpful to you under Brecht, right? Yes, it was more of a procedural point of whether it was appropriately considered since it wasn't before the district court. Okay, and it may be either side can submit a 28-J if I've misconstrued the rule, but I thought it was important to bring it up so that I get your response on it. Other questions by either of my colleagues? Can I sum up?  Okay. Sorry about that. Thank you, Your Honors. Thank you very much. All right, let's hear from Mr. Ogden, please. Thank you, Your Honors. Just a couple points. I believe as the court had flagged Van Arstel's foundational assumption is that we have to assume the damaging potential of Cross was fully realized. But is it not correct from what we discussed that in evaluating what that damaging effect was, we also take into account the countervailing arguments that would, if you will, dilute that most negative effect. Isn't that correct? I think that's sort of my problem with that is in this case at least, it's sort of assuming that the damaging potential wasn't realized. I agree that the court looks at the totality, though. And that's really what I'm saying. You look at the totality when you apply Van Arstel. Understood, Your Honor. I think that's correct. And what does that do to our Brecht analysis? Well, I think, for example, the court was discussing the preliminary testimony. If the jury heard that, I would submit that it would have hurt the district attorney's case quite a bit because what came out in prelim is Mr. Moya denying that he had an attorney, denying that he had any help with preparing this declaration, but his wife testifying to the contrary, that he had an attorney, that he showed this to me. So not only would the jury have heard that he had applied for this, they would have also heard that he lied about it. And I think that would be a particularly damning thing for them to have heard here. You've run out of time, but let me ask my colleagues whether either has additional questions. I just have one factual question. Do you know what's the status of his resentencing? I believe it's pending, Your Honor. There was quite a long delay that I'm not sure why that happened, but I believe it is pending. If the court has no further questions. I think not. Thank you both, counsel, for your argument. This is a tough case. We will decide it. The case just argued is submitted.
judges: SMITH, Hamilton, COLLINS